# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

|  |  |  |
|---|---|---|
| DAVID A. FRAZIER, | : | Case No. 3:15-cv-217 |
|  | : |  |
| Plaintiff, | : | Chief Magistrate Judge Sharon L. Ovington |
|  | : | (by full consent of the parties) |
| vs. | : |  |
|  | : |  |
| CAROLYN W. COLVIN, | : |  |
| Commissioner Of The | : |  |
| Social Security Administration, | : |  |
|  | : |  |
| Defendant. | : |  |

## DECISION AND ENTRY

## I.  Introduction

Plaintiff David A. Frazier applied for Disability Insurance Benefits and Supplemental Security Income with the Social Security Administration (in April 2011). He asserted that he could no longer work a substantial paid job as of August 25, 2000 due to "Epilepsy, brain trauma, severe anxiety and depression, mental conditions, suicidal tendencies, episodes of catatonia, [and] undiagnosed neurological disorders." (Doc. #6, PageID # 318). He subsequently amended his alleged disability onset date to January 1, 2006. His applications, medical records, and other evidence proceeded to a hearing before Administrative Law Judge (ALJ) Elizabeth A. Motta who later denied Plaintiff's application based on her central conclusion that he was not under a "disability" as defined in the Social Security Act.

Plaintiff brings the present case challenging ALJ Motta's non-disability decision. The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record (Doc. #6), and the record as a whole. Plaintiff seeks a remand for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.  Background

During all times pertinent to Plaintiff's applications for benefits, his age placed him in the category of a "younger person" under Social Security Regulations. He has a high school (GED) education. His past employment involved, in part, work as a utility clerk and floor technician.

### A.  Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Motta that he cannot work due to catalepsy and peripheral neuropathy. *Id.* at 113. He explained, "I have catalepsy, which I guess it's a form of seizure. It'll just hit me out of nowhere …."[1] *Id.* Plaintiff had been prescribed the seizure medication Dilantin but was weaned off it because he had been on it "far too long..., and it could have been the cause of the peripheral neuropathy." *Id.* at

---

[1] Cataplexy generally involves a sudden loss of muscle tone. It "can cause a number of physical changes, from slurred speech to complete weakness in most muscles …. Cataplexy is uncontrollable and is triggered by intense emotions, usually positive one such as laughter or excitement, but sometimes fear, surprise or anger…." http://www.mayoclinic.org/diseases-conditions/narcolepesy/basics/symptoms/con-20027429

113-14. At the time of the ALJ's hearing, Plaintiff took Neurontin for the peripheral neuropathy, and he was told it would also help with seizure activity. *Id.* at 114.

When Plaintiff suffers an episode of catalepsy, he goes into a "catatonic state" during which he gets "stone cold ridged" for up to five hours. *Id.* at 113-14. Before he has such an episode, he gets very ill and vomits, and this warns him an episode is about to happen. *Id.* at 114. Plaintiff testified that his last episode occurred approximately three weeks before the ALJ's hearing. *Id.* When the ALJ asked Plaintiff if he experienced catalepsy once a month, he explained:

> Well, it was happening, it got to be worse where it was once a week, and then, tapered off, I didn't have them for many months. And, then, just recently, maybe three weeks ago tops, I had another.

*Id.* at 114-15.

Plaintiff was diagnosed with peripheral neuropathy in 2012. *Id.* at 120. He suffered severe foot pain until he was prescribed Neurontin. *Id.* at 120. With medication, his foot pain is much better, but his feet still go numb and "just feel like they have pins and needles in them…." *Id.* at 120-21. Plaintiff attended physical therapy, but he stopped because it hurt too much. *Id.* at 121. The neuropathy pain and numbness cause him to have balance issues and have caused him to fall several times. *Id.* at 124.

Plaintiff testified that he also has agoraphobia. It has gotten worse in the last few years. *Id.* at 115. He does not leave his house and gets ill if he has to talk to someone on the phone. *Id.* Plaintiff testified about his symptoms associated with agoraphobia as follows:

A:      I am scared to death to go our around people.

Q:      I mean, you have to do that for the meetings, don't you?[2]

A:      Yeah, but that's [a] necessity.  If I don't, I'll get kicked out of my clinic, and then, I'll really be screwed.

Q:      Well, I mean, if you had a job, you'd have to go, wouldn't you?

A:      I suppose.

.  .  .

Q:      You claim that you're disabled…, you don't have the ability to work if you were offered, if there was a job that was say a light job where you didn't have to be on your feel, didn't have to lift, say more than 10 or 15 pounds, a low stress job, you think you could be a reliable employee and go ever[y] day? Work eight hours a day?

A:      It'd take me a while to work up to it.  I'm not sure.

*Id.* at 122-23.

Plaintiff stated that he struggles with "suicidal tendencies, just depression, constant, and anxiety nonstop." *Id.* at 125.  He has crying spells approximately once a week.  "[T]hey come out of nowhere." *Id.* at 126.  He has had audio and visual hallucinations, hearing and seeing things that he cannot explain. *Id.* at 127.  He hears "loud screaming in his ears…," and his name being called. *Id.*  He has been in mental health treatment for over a year. *Id.* at 115.  He sees Dr. Glass once a month and a therapist, Sharon Walk, twice a month. *Id.* at 115-16.  He takes the psychiatric medication Risperdal. *Id.* at 130.

---

[2] Referring to the Alcoholic Anonymous and Narcotics Anonymous meetings Plaintiff attends.

Plaintiff acknowledged he has a history of opiate abuse. *Id.* at 116. He attends treatment at the Dayton Pain Center and is prescribed an opiate substitute. *Id.* He last used illicit drugs two years and five months before the ALJ's hearing. *Id.* He had a positive drug screen in August 2012, but he believes it was a false positive. *Id.* at 115-16. At most, he drinks alcohol once a week, generally four to five beers. *Id.* at 116. He attends Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings approximately twice per week, although his doctors encourage him to go as often as possible. *Id.* at 117.

Plaintiff lives with his mother and grandfather. *Id.* at 118. When he is asked, he helps around the house. *Id.* at 118. He can cook, do dishes, do laundry, and vacuum. *Id.* at 118. He does not do any yard or garden work and does not go to the grocery store, out to eat, or to the movies. *Id.* at 119-20. He does not visit with others, and he does not belong to any clubs or organizations. *Id.* at 119. He is able to dress himself. *Id.* at 119-20. During the day, he reads, usually biographies, magazines, and war novels. *Id.* at 120.

Plaintiff did not know how long he could walk or stand at one time. *Id.* at 121-22. He can sit "for as long as possible…." *Id.* at 122. When asked if he had trouble with lifting, he responded, "I've gotten weaker." *Id.* at 122. He can lift a bag of groceries. *Id.* at 122.

**B.**     **Medical Opinions**

**i.  State Agency Record-Reviewing Physicians**

On June 28, 2011, Dr. Leslie Green reviewed Plaintiff's medical records. *Id.* at 153-64.  Dr. Green opined that "due to [seizures] and noncompliance," he can never climb ladders, ropes, and scaffolds, and he should avoid concentrated exposure to hazards such as machinery and heights. *Id.* at 160-61.  Dr. Green indicated that Plaintiff has no exertional, manipulative, visual, or communicative limitations. *Id.*  On December 3, 2011, Dr. Esberdado Villanueva reviewed Plaintiff's records and reached the same conclusions as Dr. Green. *Id.* at 181-93.

**ii.  State Agency Record-Reviewing Psychologists**

Dr. Robyn Hoffman reviewed Plaintiff's records on July 23, 2011. *Id.* at153-64. Dr. Hoffman opined that he was moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. *Id.* at 162-63.  She indicated Plaintiff has no understanding and memory limitations and no adaptation limitations. *Id.* at 162-63.  She noted, "[He] retains the ability to perform simple one, two, three, [and] four step tasks, unskilled and skilled work in a setting which is relatively static and where duties are more static & predictable to reduce stressors." *Id.* at 163.  On December 5,

2011, Dr. Caroline Lewin reviewed Plaintiff's records and agreed with Dr. Hoffman's conclusions.  *Id.* at 181-93.

### iii.  Dr. Kenneth Glass and Counselor Sharon Walk

Plaintiff first saw his treating psychiatrist Dr. Glass in May 2011.  Dr. Glass diagnosed Plaintiff with anxiety disorder and observed him to be dysphoric.[3]  Dr. Glass assessed Plaintiff's Global Assessment of Functioning (GAF) at 50-60.[4]  *Id*. at 607-09.  Dr. Glass referred Plaintiff for "counseling to discuss feelings."  *Id*. at 609.

Plaintiff next saw Dr. Glass in June 2011.  Dr. Glass again noted that Plaintiff had anxiety disorder and observed him to be dsyphoric.  His concentration was preoccupied.  He had "considered suicide" but had no ideation or plan.  *Id*. at 606.  He had no auditory hallucinations.  *Id.*  In July 2011, Plaintiff saw mental-health counselor Sharon Walk who estimated his GAF at 45.  *Id*. at 1064.  His mood was anxious, he was goal directed, had no suicidal ideation or plan, and had no audio hallucinations.  *Id*. at 1063.

Plaintiff saw Ms. Walk on June 2, 2012.  She estimated that his highest GAF in the last year had been 45.  *Id*. at 1075.  She diagnosed major depression and panic disorder with agoraphobia.  *Id*.  She observed that he avoided eye contact, and he no auditory hallucinations.  *Id*.

---

[3] In general, "dysphoria" refers to a "long-lasting mood disorder marked by depression and unrest without apparent cause; a mood of general dissatisfaction, restlessness, anxiety, discomfort, and unhappiness." Taber's Cyclopedic Medical Dictionary at 626 (19th Ed. 2001).

[4] GAF (Global Assessment of Functioning) "is a 'subjective rating of an individual's overall psychological functioning …."  *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007).

On June 28, 2012, Ms. Walk  noted that Plaintiff's mood was depressed, he was not sleeping and had chronic pain, and he did not have auditory hallucinations.  *Id*. at 1072.

Plaintiff returned to see Dr. Glass on August 11, 2012.  *Id*. at 1045.  He reported auditory hallucinations and feelings of paranoia.  Dr. Glass diagnosed Plaintiff with anxiety disorder and "R/O [rule out] psychotic disorder."  *Id*.  He prescribed a trial of Risperdal.  *Id*.  Plaintiff next saw Dr. Glass on August 25, 2012, reporting anxiety issues. Dr. Glass diagnosed anxiety disorder, and he found Plaintiff dysphoric.  Dr. Glass again noted rule out psychotic disorder.  Risperdal at first sedated Plaintiff but he adapted. Above a box check "no" auditory/visual hallucinations, Dr. Glass wrote "only auditory. He then added a downward-pointing arrow, indicating a decrease in auditory hallucinations.  *Id*. at 1044.

On October 2, 2012, Plaintiff saw Ms. Walk, who wrote, "He reported that the audible voices have gone away as a result of Risperdal."  *Id*. at 1071.  He was, however, still depressed and had trouble sleeping with chronic pain.  Ms. Walk indicated that his progress had improved.  *Id*.

Plaintiff next saw Ms. Walk on October 22, 2012.  Her notes again reflect no auditory hallucinations.  He was depressed and had trouble sleeping with chronic pain but he progress had improved.  *Id*. at 1070.  Ms. Walk noted, however, that Plaintiff "suffers from serious anxiety that causes him to stay at home and not follow through with things." *Id*. at 1071.

8

On October 27, 2012, Plaintiff saw Dr. Glass and reported that he was getting a divorce, was paranoid, and had auditory hallucinations and generalized anxiety.  *Id*. at 1043.  Dr. Glass observed that Plaintiff was dysphoric and paranoid, and he again diagnosed anxiety disorder rule out psychotic disorder.  *Id.*  Plaintiff's symptoms had not improved on his next visit to Dr. Glass in November 2012.  *Id*. at 1031.

Dr. Glass completed a mental impairment questionnaire on October 27, 2012.  *Id.* at 1049-51.  He diagnosed Plaintiff with anxiety disorder, not otherwise specified, and estimated his Global Assessment of functioning (GAF) at 50.  *Id.*  Plaintiff's signs and symptoms include sleep disturbance, mood disturbances, delusions or hallucinations, recurrent panic attacks, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, time distortion, some social withdrawal or isolation, generalized persistent anxiety, and hostility and irritability.  *Id.* at 1049.  Dr. Glass opined that Plaintiff's prognosis is "guarded," and his impairment has lasted or is expected to last at least twelve months.  *Id.* at 1050.  Dr. Glass indicated that hypertension and chest pain are likely exacerbated by his psychiatric condition.  *Id.* at 1050.  He believed that Plaintiff would likely be absent from work more than three times per month due to his impairments and treatment.  *Id.* at 1051.

Dr. Glass concluded that Plaintiff has slight restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and extreme deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and episodes of deterioration or decompensation in work.  *Id.* at 1051.

In December 2012, Plaintiff told Dr. Glass that he was "'doing alright" but his symptoms were the same.

In the end, Dr. Glass's records indicate that Plaintiff saw him for treatment twice in 2011, 5 times in 2012, and 4 times from January to April 2013. *Id*. at 606-09, 1043-48, 1126-32.

### iv.  Dr. Paul Kirila

Plaintiff's family-care physician, Dr. Paul Kirila, completed a mental impairment questionnaire on October 25, 2012. *Id.* at 1033-35. He noted he has treated Plaintiff monthly since July 29, 2010. *Id.* at 1033. Dr. Kirila opined his prognosis was poor, his impairment lasted or can be expected to last at least 12 months, and his psychiatric conditions exacerbate his pain. *Id.* at 1034. He indicated that Plaintiff's impairment and treatment would cause him to be absent from work more than three times per month. *Id.* at 1035. Dr. Kirila concluded Plaintiff has moderate restrictions of activities of daily living; moderate to marked difficulties in maintaining social functioning; and marked deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner and episodes of deterioration or decompensation in work. *Id.* at 1035.

Dr. Kirila also answered interrogatories. *Id.* at 1036-42. He indicated that he treated Plaintiff for both his seizure disorder and peripheral neuropathy. *Id.* at 1037. He noted Plaintiff's seizure activity is erratic and varies "daily to monthly." *Id.* at 1038. Dr. Kirila opined that Plaintiff could not be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy without

10

significant risk of physical or psychological decompensation or worsening of his impairments; demonstrate reliability; and complete a normal workday or workweek without interruption from symptoms and perform at a consistent pace without unreasonable numbers and length of rest periods. *Id.* at 1040-41. Dr. Kirila indicated that Plaintiff's depression with suicidal thoughts, anxiety, catalepsy, and paranoia influence his level of functioning as it relates to working a full-time job. *Id.* at 1040.

### III.  "Disability" Defined <u>And The ALJ's Decision</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"— as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—*i.e.*, "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70. Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record

contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

In the present matter, ALJ Motta evaluated the evidence at each of the five sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[5]  She reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since January 1, 2006.

Step 2:    He has the severe impairments of seizure-like disorder, anxiety disorder, substance abuse disorder in possible remission, and (since April 2012) peripheral neuropathy.

Step 3:    He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work "subject to the following limitations:  sitting for 15 minutes per hour; no climbing ropes, ladders, or scaffolds; no exposure to hazards, such as moving or dangerous machinery or working at unprotected heights; no use of foot controls bilaterally; no exposure to vibration; simple, routine and repetitive tasks; low stress work defined as no strict production quotas or fast pace, few changes in the work setting; no contact with the public; and only occasional contact with supervisors and co-workers."

Step 4:    He is unable to perform any of his past relevant work.

Step 5:    He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 85-98).  These main findings led ALJ Motta to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 98.

---

[5] The remaining citations to the Regulations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

## IV.   Discussion

Plaintiff contends that the ALJ failed to follow the Social Security Admini-stration's regulatory requirements in weighing the opinion evidence.  He reasons that the treating psychiatrist, physician, and counselor's opinions are relatively consistent with each other and not inconsistent with the record as a whole.  He also asserts that the ALJ erred in finding that Plaintiff was not credible.

The Commissioner maintains that the ALJ reasonably weighed the opinion evidence and substantial evidence supports ALJ's finding that Plaintiff was not fully credible.

### A.   Medical Opinions

Social Security Regulations recognize several different categories of medical sources:  treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."

14

*Id.* (quoting in part Soc. Sec. Ruling 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996), and citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)–(2)).  To effect this hierarchy, the Regulations adopt the treating physician rule.  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Id.* at 376 (quoting in part 20 C.F.R. § 1527(c)(2)); *see Gentry*, 741 F.3d at 723.  If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id*. (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight.  *Id*.  Substantial evidence must support the reasons provided by the ALJ.  *Id*.

### B.      Dr. Glass, Dr. Kirila, and the State-Agency Record Reviewers

Plaintiff argues that the ALJ improperly evaluated the opinions of Dr. Glass and

Dr. Kirila by failing to consider the substantial increase in his mental health impairments

since the Spring of 2012.  The record, he points out, reflects that he experienced an

increased anxiety disorder with worsening symptoms in June 2012.  He emphasizes that,

based upon ongoing treatment records after June 2012, both Drs. Glass and Kirila opined

that he does not have the functional capacity to maintain substantial gainful activity.

Plaintiff concludes, "The ALJ improperly evaluated this evidence and, thus, her findings

are not supported by substantial evidence and are based on errors of law."  (Doc. #7,

*PageID*# 1172).  He additionally points out that the ALJ incorrectly found no indications

of visits by Plaintiff to Dr. Glass after June 2011 and completely ignored the four

consultations Plaintiff had with Dr. Glass between June and October 2012.

A problem Plaintiff (and the Commissioner) overlooks is that, although he did see

Dr. Glass four times between June and October 2012, it appears those treatment records

were not presented to the ALJ.  They were added to the administrative record by the

Appeals Council in May 2015, nearly 2 years after the ALJ issued her decision.  *See* Doc.

#6, *PageID*#s 63-64, 110.  If this is correct, the ALJ did not overlook this evidence; it

simply was not before her when she made her decision.  In addition, "evidence submitted

to the Appeals Council after the ALJ's decision cannot be considered part of the record

for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th

Cir. 2001).  The Court may remand the matter to the Social Security Administration for

further proceedings in light of such evidence.  *Id.*  This occurs when the evidence is new

and material, and good cause exists for "not presenting it in the prior proceeding."  *Id.*

Because Plaintiff has neither argued nor shown that Dr. Glass's treatment records from

June to October 2012 constitutes new and material evidence, remand for consideration of

this evidence is unwarranted.

Even if the 2012 treatment records were, in fact, before the ALJ, she did not err in

weighing Dr. Glass's opinions.  Instead, the ALJ applied the correct legal criteria to Dr.

Glass's opinion, *see* Doc. 6, *PageID*#s 93-94, and substantial evidence supports her

reasons for discounting Dr. Glass's opinions.  The ALJ detailed the correct legal criteria

applicable to the assessment of treating medical sources' opinions.   She then provided

good reasons, as the Regulations require, for not placing controlling or deferential weight on

Dr. Glass's opinions.

The ALJ contrasted Dr. Glass's opinion that Plaintiff experienced "extreme"

episodes of  deterioration or decompensation with evidence showing he had experienced

only one episode of altered mental activity, which was associated with alcohol abuse.  *Id.*

at 91-92, 94.  Further, the ALJ noted that Dr. Glass's pessimistic opinion was not

supported by  Plaintiff's drug treatment records from the Dayton Pain Center.  *See id.* at

95.  Those records show that Plaintiff met with Leroy Goodson, M.D. for treatment at the

Dayton Pain Center twice per month beginning in 2011 and continuing through

September 2012.  *Id.* at 967-1014.  Dr. Gobson performed a mental status examination at

each visit and, as the ALJ noted, the results were essentially normal.  On each visit with

17

Dr. Gobson, Plaintiff completed a progress report rating his symptoms, including anxiety. In August 2012—just two months before Dr. Glass's October 2012 opinions—Plaintiff rated his anxiety on a scale of zero (no anxiety) to four (extreme anxiety). On August 21, 2012, he indicated having no anxiety at all. *Id.* at 974. On August 28, 2012, he rated Plaintiff's anxiety at two, indicating a moderate level of anxiety. *Id.* at 969. This tends to show that his treatment at the Dayton Pain Center was helping reduce his anxiety level from what had been, in July 2012, a rating of three. *Id.* at 964, 974-76.

As the ALJ noted, in August 2012, that psychologist Dr. Vrag Chauhan, Ph.D., performed a mental examination of Plaintiff resulting in normal findings (including no delusion), and he assigned a GAF or 65 (indicating, in general, mild symptoms or limitations). *Id.* at 95, 970-71. This was consistent with many of Dr. Chauhan's observations. He reported, for example, that Plaintiff's affect was appropriate; his mood was euthymic; his speech was normal/fluent; his thought process was intact; hallucinations, delusions, and phobias were not present; he had no suicidal ideations; and his self-perception indicated "no impairment." *Id.* at 971. Additionally, the evidence concerning Plaintiff's frequent treatment at the Dayton Pain Center throughout 2012 fails to support Dr. Glass's opinion and stands in contrast to his assertion of a "substantial increase in his mental health impairments since spring 2012." (Doc. #11, *PageID* # 1172). Notably, Plaintiff's Statement of Errors does not discuss his treatment at the Dayton Pain Center or question the ALJ's finding these treatment records to be inconsistent with Dr. Glass's opinion.

18

The ALJ also did not err in finding that Dr. Glass's assessment of Plaintiff's GAF at 50, within his opinions and treatment notes, were inconsistent with his opinions concerning Plaintiff's extreme limitations.  "A GAF score is a 'subjective rating of an individual's overall psychological functioning,' which may assist an ALJ in assessing a claimant's mental RFC.  GAF scores are 'not raw medical data,' and 'the Commissioner has declined to endorse the [GAF] score for use in' Social Security benefits programs.  [A]lthough a GAF score is 'not essential to the RFC's accuracy,' it nevertheless 'may be of considerable help to the ALJ in formulating the RFC.'"  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016)(quoting, in part, *Howard v. Comm'r of Soc. Sec.*, 235, 241 (6th Cir. 2002) (other citations omitted).  As ALJ Motta noted, a GAF of 50 was at the higher end of assessments in the serious range.  *Id.* at 94.  The ALJ also cited to Dr. Glass's initial examination, which rated Plaintiff's GAF at 50-60.  *Id.* (citing *PageID #* 609).  A GAF of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers." Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th Edition, Text Revision 2000).  In light of these circumstances in this particular case, the ALJ did not err by discounting Dr. Glass's opinions based on Plaintiff's particular GAF scores.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) ("even assuming GAF scores are determinative…," a GAF of 45-50 "would not preclude [Smith] from having the mental capacity to hold at least some jobs in the national economy).  The same goes for the ALJ's decision to assign little weight to Ms. Walk's assessment of Plaintiff's GAF at 45.

19

Moreover, Plaintiff ignores the GAF of 65 assigned by Dr. Chauhan, Ph.D., in August 2012, indicating mild symptoms or limitations. *See* Doc. #6, *PageID*# 95 (citing *PageID*#s 970-71).

Plaintiff also points out that later treatment records evidence he was experiencing auditory hallucinations. However, the ALJ correctly recognized that Dr. Glass's indications of hallucinations were based on Plaintiff's reports rather than clinical observations. *Id.* at 1043-45, 1050.

Plaintiff further contends that the ALJ erred by applying more rigorous scrutiny to the treating medical sources' opinions, Drs. Glass and Kirila, than she applied to the opinions of the state agency medical sources' opinions. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulations require." *Gayheart*, 710 F.3d at 379. This rule potentially competes, in some cases, with the Commissioner's recognition that state-agency medical are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Soc. Sec. Rul. 96-6p, 1996 WL 374180 at *2. In the present case, rather than reversing the required analysis, ALJ Motta identified substantial evidence supporting the state-agency psychologists' opinions and reasonably concluded that their opinions were consistent with substantial evidence. *See* Doc. #6, *PageID*#s 88-89, 96; *see also Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 633, 2016 WL 124140 (6th Cir. 2016) ("It cannot be said that the ALJ did not subject the non-examining sources'

opinions to scrutiny simply because he adopted their opinions but discredited the treating source opinions.").

Plaintiff contends that the ALJ's one-reason acceptance constituted the same error identified in *Conley v. Comm'r of Soc. Sec.*, 3:13cv00165, 2014 WL 1057696 (S.D. Ohio, March 18, 2014) (Report & Recommendation).  This contention lacks merit because, unlike in *Conley*, ALJ Motta provided sufficient reasons supported by substantial evidence to credit the state-agency psychologists' opinions.  Additionally, the ALJ did not uncritically accept the state-agency psychologists' opinion.  She instead found that later-submitted evidence warranted further limitations than those opined by these medical sources.  *See* Doc. #6, *PageID*# 96.

In summary, although Plaintiff maintains that ALJ Motta should have weighed the opinion evidence differently, substantial evidence supports her consideration of those opinions.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th  Cir. 2003). The substantial evidence standard presupposes that there is a zone of choice within which the decision maker can go either way, without interference by the courts.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).  The ALJ's explanation for why she found Dr. Glass's opinions merited little weight was within the zone of reasonable choices.  She likewise provided a reasonable explanation, supported by substantial evidence, for how and why she weighed the opinions of the state-agency psychologists.

Accordingly, Plaintiff's challenges to the ALJ's review of the medical source opinions lack merit.

### C.    Plaintiff's Credibility and Symptoms

Plaintiff asserts that it was improper for the ALJ to rely on his lack of mental health treatment as a reason to discount his credibility.  He argues, moreover, that the ALJ's assessment of his credibility is inherently illogical.  He finds a conflict between, on one hand, the ALJ's finding that given the serious symptoms Plaintiff described, "it would be expected" for him to seek out treatment sooner; and, on the other hand, the fact that these very symptoms explain why he would be reluctant to seek outside help.  (Doc. #7, *PageID*# 1176).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007).  However, substantial evidence must support an ALJ's credibility assessment.  *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

Generally, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir. 1989).  However, in this case, the record reflects gaps in Plaintiff's mental-health treatment.  Approximately one year lapsed between the time

22

Plaintiff saw Dr. Glass in June 2011 and Ms. Walk in July 2011, and his next visit to each of them in the Summer of 2012.  Given such a wide gap in treatment, it was not error for the ALJ to consider this as one factor in her credibility assessment.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009) ("in this case there is no evidence in the record explaining White's failure to seek treatment during this half-year gap.  A 'reasonable mind' might therefore find that the lack of treatment during the pre-November 4, 2002 time frame indicated an alleviation of White's symptoms) (citation omitted).

Moreover, the gap in mental health treatment was only one of several reasons the ALJ provided partially discrediting Plaintiff.   For example, the ALJ noted that contrary to Plaintiff claim that he did not use opiates, a drug screen in June 2012 was positive for morphine.  *See id*. at 92 (citing *PageID*#s 967, 977).  The ALJ also recognized an inconsistency in Plaintiff's allegation of agoraphobia—"I don't ever leave my house whatsoever"— and the fact that he attends AA/NA meetings twice per month.  *See* id. at 115, 117-18.   Plaintiff also indicated that he suffered from catalepsy and, at times, he suffered up to four seizure episodes a month, although he could also go months without an episode.  *Id*. at 113-15.   In contrast, the ALJ cited to an assessment by neurologist Sharon Merryman, M.D., finding that he did not have epilepsy, but rather a stress-type response.  *See id*. at 91 (citing *PageID*# 695).  And, the ALJ cited to EEGs that failed to reveal any epiletiform features.  *See id*. at 91 (citing *PageID#s* 478-79, 499-50).  The record, moreover, documented two instances of "seizure" episodes, one in August 2010

23

and another April 2011, rather than the sometimes more frequent episodes Plaintiff

described. *See id*. at 91 (citing *PageID*#s 456, 487-88).

Accordingly, for these reasons and given that an ALJ's credibility assessment are

generally due great deference, *Walters,* 127 F.3d at 531, Plaintiff's challenges to the

ALJ's credibility determination lack merit.

<b>IT IS THEREFORE ORDERED THAT</b>:

1.    The ALJ's non-disability decision is affirmed;

2.    The Clerk of Court is directed to enter Judgment in favor of the
      Commissioner and against Plaintiff; and

3     The case is terminated on the Court's docket.


Date:  August 22, 2016                         */s/Sharon L. Ovington*
                                               Sharon L. Ovington
                                               Chief United States Magistrate Judge

24